UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CITY OF AUSTIN POLICE RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) | CASE NO. 1:04-cv-0380-DFH-TAB |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., RENE R. CHAMPAGNE, OMER E. WADDLES, KEVIN M. MODANY, GENE BAUGH, CLARK D. ELWOOD, THOMAS W. LAUER, RAND V. ARASKOG, HARRIS N. MILLER, JOHN E. DEAN, and DANIEL P. WEADOCK, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTION TO DISMISS

On February 24, 2004, federal law enforcement agents executed search warrants on the headquarters and ten local offices of ITT Educational Services, Inc. The agents sought documents relating to student placement, retention, grades, attendance, and other data that were key for ITT's educational business and its eligibility to participate in federal education programs. ITT announced these events on February 25, 2004. Its stock price fell by one third that day. The next day, on February 26, 2004, the first of several parallel cases alleging securities fraud was filed in this court. Two weeks later, on March 9, 2004, ITT announced that it was the subject of an SEC investigation and that it had been

under investigation by the Attorney General of California since October 2002. The stock price dropped another 12 percent.

More recently, on June 24, 2005, the United States Attorney for the Southern District of Texas, which had led the federal criminal investigation, informed ITT that the company and its senior management were no longer designated as either targets or subjects of a criminal investigation. On July 25, 2005, SEC enforcement staff informed ITT that it had terminated its investigation and that no enforcement action had been recommended to the SEC.

In this consolidated case, lead plaintiff City of Austin Police Retirement System seeks to represent a class of plaintiffs who purchased securities of defendant ITT between October 17, 2002, and March 8, 2004 (the "class period"). Plaintiff and others filed suits against ITT and several of its senior executives under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and under Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. The plaintiffs allege that defendants made material misrepresentations that caused the market price of ITT stock to be artificially inflated during the class period. Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a), several related cases were consolidated and the City of Austin Police Retirement System was designated lead plaintiff. It has filed a consolidated class action complaint.

Defendants have moved to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted.  They invoke Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the PSLRA provisions codified in 15 U.S.C. § 78u-4(b).  For reasons stated below, the plaintiff's section 10(b) and Rule 10b-5 claims do not meet the heightened pleading requirements of Rule 9(b) and the PSLRA.  Plaintiff's section 20(a) claim fails under Rule 12(b)(6) to state a claim upon which relief can be granted.  Accordingly, the defendants' motion to dismiss is granted, though without prejudice to the plaintiff's ability to amend the complaint.

*Standards for Dismissal*

In ruling on a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the court must assume as true all well-pleaded facts set forth in the complaint, construing the allegations liberally and drawing all inferences in a light most favorable to the plaintiff.  *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir. 2000).  Under the liberal notice pleading standard in federal civil actions, the plaintiff is entitled to the benefit not only of its allegations but of any other facts it might assert that are not inconsistent with its allegations.  Thus, in responding to a motion to dismiss, a plaintiff may posit new facts in a brief and, so long as they are not inconsistent with the complaint, the court must assume they are true for purposes of deciding the motion.  See, *e.g., Trevino v. Union Pacific Railroad Co.,* 916 F.2d 1230, 1239 (7th Cir. 1990) (reversing dismissal).  Defendants are entitled to dismissal only where "it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Chaney v. Suburban Bus Division*, 52 F.3d 623, 626-27 (7th Cir. 1995).

Rule 9(b) and the PSLRA impose more demanding pleading standards on plaintiffs alleging fraud in general and securities fraud in particular. Under Rule 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity." See *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996). In securities fraud cases, Rule 9(b) requires that the alleged fraud be pled "in detail," which means in essence that the plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The PSLRA further requires of securities fraud plaintiffs that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, while Rule 9(b) allows state of mind to be "averred generally," the PSLRA imposes a substantially higher standard for securities fraud: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the complaint fails to meet

the PSLRA standard, "the court shall, on the motion of any defendant, dismiss the complaint[.]"  15 U.S.C. § 78u-4(b)(3)(A).

*Factual Allegations*

I.     *Background*

Defendant ITT Educational Services, Inc. is a provider of private, for-profit post-secondary education emphasizing technology-oriented programs.  ITT offers non-degree and associate's, bachelor's, and master's degree programs in 77 institutes located in 30 states in the United States.  Cplt. ¶ 30.  ITT's financial performance is highly dependent on its eligibility to participate in programs under Title IV of the federal Higher Education Act of 1965.  ITT students receive loans, grants, and other aid to fund the cost of an education at ITT through various Title IV programs.   In 2002 and 2003, Title IV funding accounted for 65 percent and 71 percent of ITT's revenue respectively.  Cplt. ¶ 32.

Participation in Title IV programs subjects ITT to intensive regulation by the United States Department of Education ("DOE").  Cplt. ¶ 36.  To retain its eligibility for Title IV programs, ITT must achieve certain standards related to student enrollment, attendance, grade point average, program completion, and job placement.  Cplt. ¶¶ 36-37.

ITT's institutes are subject to audits and program compliance reviews by various external agencies, including the DOE and state agencies. State accreditation by an accrediting commission recognized by the DOE is required for Title IV eligibility. Significant violations of Title IV program requirements can be the basis for a DOE proceeding to limit, suspend, or terminate Title IV eligibility. Cplt. ¶¶ 38-41. ITT's business success and its stock price depend on maintaining compliance with federal and state regulations, on maintaining its state accreditation, and on its reputation with students and investors. Cplt. ¶ 3.

II.    *Allegations of Misconduct*

The plaintiff alleges:

Throughout the Class Period, ITT publicly touted its business and financial performance, the performance of its stock price, and its ability to enroll and keep students in its institutes to entice investors to purchase the stock. Such representations were included in the Company's press releases, conference calls with analysts, and public filings with the SEC. Those representations, however, were materially false and misleading as they failed to disclose to the investing public that ITT had been regularly falsifying records used as indicators of its operational success, which were also the key metrics for approval by accrediting agencies and requirements for federal and state funding. The strong growth reported by the Company throughout the Class Period was grounded upon these fraudulent and inherently unsustainable practices, rendering ITT's reported financial historical performance and projections of future growth materially false and misleading.

Cplt. ¶ 4.

To support these allegations, plaintiff relies heavily on interviews with former ITT employees. According to plaintiff, these interviews "confirm that, during the Class Period, Defendants used a host of tricks to falsify student information, including inflating enrollment figures, counting students as 'enrolled' who never attended ITT, double counting enrollees, changing and falsifying grades, and misrepresenting attendance and placement rates." Cplt. ¶ 5. Paragraphs 55-85 contain the heart of plaintiff's factual allegations of misconduct.

Paragraph 55: "According to a former ITT director of admissions in Salt Lake City, Utah during 2001, a directive came from the district manager ordering recruitment directors to identify people who had merely expressed an interest in applying to the school as part of the institute's gross enrollment figures." According to the former director, "nearly 70 to 80 percent of the prospects included in the gross enrollment never attended class."

Paragraph 56: "Another former director of finance" at the ITT institute in San Antonio, Texas recalled that a new computer software system introduced companywide in 2001 identified any person who merely expressed an interest in enrollment as an enrollee.

Paragraphs 57-58: A "former director of recruitment" at an ITT institute in Bothell, Washington, "similarly stated that students were recorded [on the companywide software system] when they walked in the door." Anyone who

walked in the door was recorded as having "applied." "However, a substantial portion of those in the applied category never started school or attended class."

Paragraph 59: "According to [a] former director of recruitment in Spokane, Washington," ITT was able to inflate enrollment figures by manipulating the start and stop dates for each quarter to count more students as enrolled in each respective quarter.

Paragraph 60: "A former director of recruitment in Bothell, Washington, also confirmed that during 2002, administrators routinely extended the start dates of classes by two weeks, so they could continue to enroll students and boost their enrollment figures."

Paragraph 61: "[A]n email dated May 31, 2002, from an ITT Technical Institute director in Bothell, Washington to another district manager, entitled 'April/May close rate,'" stated: "I was doing some number crunching. *We both know how to lie with statistics,* but what the heck, it reflects well for [the Institute], even if it doesn't demonstrate volume. . . . (emphasis added)."

Paragraph 63: A "former dean of academics" at an ITT institute in Memphis, Tennessee reported that the director of that institute "ordered that students who were graduating with associates degrees but could not find jobs be convinced to enroll again for a bachelor's degree" so that the institute could count them as both

a new enrollee and a job placement.  "According to this former dean of academics, the double counting was specifically intended to inflate enrollment rates to inflate ITT's stock price:  'It was just a game to keep the numbers up so the stock would look good.'"

Paragraph 64:  A "former student recruiter" for an ITT institute in Anaheim, California, stated that ITT concealed poor statistics for its two-year programs by telephoning students who had dropped out or graduated but were unemployed and persuading them to re-enroll in four-year programs so they would not appear as drop-outs or as unemployed.  "In May 2003 alone, 'hundreds' of these telephone calls were made. . . . Additionally, according to this former ITT employee, 'many of the students that were listed as enrolled had actually dropped out,' and 'many of the students were placed in temporary agencies and not the career where they had graduated.'"

Paragraph 65:  "A former ITT employee who worked as a master admissions representative" at an ITT institute in San Bernardino, California "concealed adverse student statistics by switching students from program to program."  When contacting students to persuade them to switch, "this former ITT employee discovered that most of the students characterized by ITT as still enrolled had in fact already dropped out."

Paragraph 66:  Former instructors at an ITT institute in Sylmar, California testified at a 2002 worker's compensation court proceeding that supervisors at the Sylmar facility routinely inflated attendance figures.  One of the former instructors testified that instructors were reprimanded for excessive absentees in their class.  This former instructor testified that he had more than once seen an education supervisor at Sylmar change attendance figures on the school's computer.

Paragraph 67:  Another former instructor at Sylmar testified [presumably in the same 2002 proceeding] that student absences were underreported and the totals were manipulated.  The former instructor testified regarding attendance records:  "I found from November, to my specific knowledge, from November 1999 right through the first quarter of this year 2002," the records were altered regularly.

Paragraph 70:  "A former ITT instructor at the ITT Technical Institute in Spokane, Washington also confirmed that the dean of his institute said that 'if a student shows up for a class – even for a couple of minutes – mark them down as present.'"

Paragraph 71:  A former instructor at the ITT institute in Sylmar, California reported that attendance records were manipulated at Sylmar throughout 2002.  This former instructor reported this misconduct to ITT's Vice President of National Academic Affairs and to ITT's legal counsel in October 2002.

Paragraph 73: "A former electronics instructor at the ITT Technical Institute in Albuquerque, New Mexico, also noted there was pressure from management, the dean, the institute director, and the program chairmen to keep students in school, even if they were failing [to] prevent these students from dropping out or falling below required grade point averages."

Paragraph 74: "A former ITT marketing representative/recruiter at an ITT Technical Institute in Little Rock, Arkansas confirmed that students routinely received grades that were inflated. One former student received an 'A' on a test that he did not even take."

Paragraph 76: "A former ITT instructor" at the Spokane, Washington institute recalled that in reviewing the school's computer records he found that the grades of five students whom he had failed had been changed to passing grades.

Paragraph 77: "One former instructor at Sylmar recalled instances of grade falsification where another instructor 'complained to me that her student's grade had been changed.' . . . This former instructor was told of a 'whole class of students given A's at the very least.'"

Paragraph 78:  Another former instructor at Sylmar confirmed that grades and attendance figures were regularly falsified and that he was laid off for refusing to take part in the manipulations.

Paragraph 80:   A "former ITT employee from the Torrence, California Campus stated that ITT fabricated and stretched its student statistics and that ITT's graduate placement figures were inaccurate by at least 20%."

Paragraphs 82-83:  "ITT institutes in California and Memphis both carried out systematic and orchestrated document destructions, undoubtedly to conceal the fraudulent activities from government investigators."  The complaint refers to a "corroborated account by a former student recruiter in California" stating that several ITT employees spent a Saturday in October 2003 shredding student records and financial aid documents at ITT's Anaheim campus under the direction of managers "before an impending review by California state auditors concerning student financial aid matters."

Paragraph 85:  "Another former recruiter and marketing representative" at the ITT institute in Memphis, Tennessee, "recounted that one or two days before federal agents seized documents from ITT institutes around the country in February 2004, the director of recruitment at the school in Memphis erased about 6 weeks' worth of data related to the enrollment of students."

The complaint further alleges events related to three government investigations of ITT institutions.  On February 25, 2004, ITT announced in a press release that federal agents had executed search warrants the day before at the company's headquarters and 10 of its 77 institutes.  The records related to placement, attendance, graduation rates, recruitment and admissions.  ITT's stock price dropped 33 percent from a close of $57.40 per share on February 24th, to a close of $38.50 per share on February 25th.  ¶¶ 134-35.

On March 9, 2004, ITT revealed that it was under investigation by the federal Securities and Exchange Commission and that it had been under investigation by the California Attorney General's office since October 2002.  The California investigation related to whether one or more of the California ITT institutes had falsified records related to student attendance or academic progress or falsified grade point average calculations used to qualify for state financial aid. Following this disclosure, ITT's stock price dropped from a closing price on March 8th of $34.87 per share, to $28.29 per share on March 15th.  ¶ 136, 138.

More recently, on June 24, 2005, the United States Attorney's Office for the Southern District of Texas, which had led the criminal investigation resulting in the searches in February 2004, informed ITT that the criminal investigation "has not revealed evidence sufficient to continue the designation of ITT or any of its 'senior management' (defined as executives at the headquarters level), as targets or subjects."  On July 25, 2005, the SEC advised ITT that the SEC had terminated

its investigation of ITT and that no enforcement action would be taken against ITT. As far as the court knows, the California Attorney General's investigation may be continuing.

III.    *Allegations of False and Misleading Statements*

In paragraphs 86-132, the complaint identifies numerous press releases, conference calls with financial analysts, and quarterly and annual financial reports filed with the SEC as containing materially false or misleading statements allegedly attributable to the defendants.

Many of the press releases and conference calls reported robust increases in student enrollment.  Many attributed increased revenues, earnings per share, or other indicia of financial performance to increases in student enrollment.  *E.g.*, ¶¶ 87, 89, 93-6, 100-04, 107-12, 117-20, 125-28.

The financial statements and reports stated (1) that the financial information contained in them was prepared according to generally accepted accounting principles ("GAAP"), and/or (2) that the information did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements . . . not misleading," and/or (3) that the financial statements and information contained in them "fairly present in all material respects the financial condition, results of operations and cash flows of the Company."  *E.g.*, ¶¶ 91-92, 98-99, 104-06, 114-16, 122-24, 130-32.

Paragraph 133 states that the statements described in paragraphs 86-132 "were false and misleading when made because they failed to disclose and misrepresented the following materially adverse facts":

>   (a)  ITT systematically falsified records related to enrollment, attendance, grades, graduation rates, and placement to help pass government audits.

>   (b)  A material portion of ITT's revenues was improperly recognized because it was derived from federal grants and financial aid payments that were paid to ITT based on falsified student records.

>   (c)  Statements in press releases attributing ITT's financial success to strong business practices or competitive advantages were actually attributable to fraudulent and prohibited business practices.

>   (d)  ITT failed to disclose that it had falsified student records "placing its accreditation at risk and jeopardizing significant revenue from federal funding, which would have had a devastating impact" on the company.

>   (e)  ITT's financial statements were not prepared according to GAAP, and did not fairly present its financial condition.

>   (f)  The defendants failed to disclose the existence of the California Attorney General's investigation of the company, which began in October 2002 and continued throughout the class period.

*Discussion*

Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful for any person by the use of "any facility of any national securities exchange [to] use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission

may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).

Rule 10b-5 is one such rule.  It makes it unlawful for any person, by the use of any national securities exchange, (a) to "employ any device, scheme, or artifice to defraud," (b) to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or (c) to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

To prove a violation of Rule 10b-5, a plaintiff must prove that:  "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages."  *Caremark, Inc. v. Coram HealthCare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997), citing *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996).

The basic theory of the complaint is that ITT's statements to investors during the class period were fraudulent because they failed to disclose that the company systematically, deliberately, and falsely inflated student enrollment,

retention, attendance, performance, and placement data, and failed to disclose the existence of the California investigation.  The defendants argue that the plaintiff's allegations of false statements or omissions lack the details and particularity sufficient to satisfy Rule 9(b) and the PSLRA.  The defendants do not challenge the sufficiency of the plaintiff's allegations regarding the statements themselves. Rather, the defendants challenge the plaintiff's allegations of the underlying conduct which, according to plaintiff, rendered the statements false or misleading. In other words, defendants assert that the plaintiff failed to allege adequately how the statements were misleading.  See *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).  According to the defendants, to the extent plaintiff's allegations are made on information and belief, plaintiff has failed to meet the PSLRA's requirements to specify "why the statement is misleading" and to "state with particularity all facts on which that belief is formed."  The defendants attack the plaintiff's pleadings based on (1) the significance of the federal investigations, (2) the testimony of the confidential witnesses, (3) the alleged GAAP violations,  and (4) the California Attorney General's investigation.  Finally, defendants claim that the plaintiff has not adequately pled scienter.

I.    *Termination of the Federal Investigations*

After the argument on defendants' motion to dismiss, defendants filed two motions to supplement the record with public information:  the termination of the criminal investigation by the United States Attorney for the Southern District of Texas and the investigation by the SEC.  Defendants' motions for leave to file their

two supplemental briefs (Docket Nos. 156 and 160) are hereby granted over plaintiff's objections.  Plaintiff's opposition stated its views on the merits of defendants' tendered briefs.  The motions are granted because the existence of the investigations played such a critical role in the complaint and in plaintiff's opposition to the motion to dismiss.

Plaintiff has correctly pointed out that the termination of a criminal investigation does not necessarily mean there is no viable civil claim against the targets or subjects of the criminal investigation.  Similarly, the termination of an SEC investigation could have been based on any number of factors not related to the merits of this civil action.  See SEC Release No. 530, at 4 (attempted use of SEC No-Enforcement Letter in civil or criminal action against investigated party is "clearly inappropriate and improper").

In this case, however, plaintiff has attempted to use the existence of the investigations to support its allegations that ITT and its senior officials were engaged in a widespread and systematic scheme to defraud the government and investors by falsifying data about student enrollment, placement, grades, and attendance.  Plaintiff's brief opposing dismissal repeatedly claims that instances of fraud have been identified at 30 percent of ITT's local institutes.  The 30 percent figure is based on the eleven institutes concerning which plaintiff has offered statements from confidential witnesses and ten institutes where search warrants

-18-

were executed.  Plaintiff has treated the execution of the search warrants as proof of wrongdoing:

> Importantly, these allegations by former employees at eleven ITT institutes are in addition to the ten ITT institutes that were raided by federal agents seeking documents related to the same types of manipulations described by the confidential witnesses in the Complaint.  In other words, instances of wrongdoing have already been identified at nearly 30% of ITT institutes nationwide.

Pl. Br. at 1.  Plaintiff made similar misuse of this information on page 2 (scoffing at defendants' suggestion they could not have known about "fraudulent practices that took place at nearly 30% of the ITT institutes nationwide"), page 13, page 17, and page 27, and plaintiff repeatedly asserted that the court must view its allegations as a whole, including the presumption of wrongdoing based on the execution of the search warrants and the existence of the SEC investigation.  *Id.* at 17, 18, 25, 31-32.

Based on plaintiff's own use of the federal criminal and SEC investigations, it is only fair to allow defendants to inform the court of the rest of the story.  The court does not treat the decisions of the United States Attorney and the SEC staff as exoneration of the defendants for civil purposes.  Instead, the court treats those decisions as effectively negating the adverse inferences plaintiff has sought to draw from the existence of those investigations.  In addition, the sharp drop in ITT's share price on the day it disclosed the search warrants shows that a company's share price can drop suddenly without any evidence or finding of wrongdoing by the company or its senior management.

As noted above, the court has no information outside the complaint about the status of the California Attorney General's investigation.  Suffice it to say, however, that the mere existence of that investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of the company or its senior management.  Whether the existence of the investigation should have been disclosed earlier to investors is addressed below in Part III.

II.     *The Confidential Witnesses*

Apart from relying on the existence of the investigations as smoke showing there must be a fraudulent fire burning, plaintiff has included in its complaint summaries of statements of unidentified former employees of ITT about alleged events at their institutes and communications from ITT headquarters.  The defendants argue that the plaintiff's allegations based on confidential witness testimony fail to establish that the witnesses were employed during the class period or that the witnesses had personal knowledge of the facts they reported.  Defendants further argue that the allegations based on witness testimony fail to allege *when* the misconduct occurred, permitting no inference that it affected statements made during the class period.  The court agrees.  The allegations suffer these deficiencies and others.  The deficiencies undermine plaintiff's effort to allege a corporate-wide scheme to defraud the government and investors.

The plaintiff counters that it has described the confidential witnesses "with sufficient particularity to support a finding that the witnesses were in a position

to possess the information provided." Pl. Br. at 17, citing *Johnson v. Tellabs*, 303 F. Supp. 2d 941, 952 (N.D. Ill. 2004), and *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000). In *Novak*, the Second Circuit articulated a standard for determining the sufficiency of confidential witness testimony under the pleading requirements of the PSLRA. The Second Circuit stated that while witnesses need not be named, they must be "described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." 216 F.3d at 314.

The Seventh Circuit has not yet addressed the application of the PSLRA to securities fraud pleadings based on confidential witness statements. Other circuits have found the *Novak* standard persuasive. See *In re Daou Systems, Inc., Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004); *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 351-54 (5th Cir. 2002); *In re Cabletron Systems, Inc.,* 311 F.3d 11, 29-31 (1st Cir. 2002).

The *Novak* standard has not been met in this case. All of the anonymous witnesses are alleged to be former ITT employees. With few exceptions, plaintiff provides no dates or facts regarding when the confidential witnesses were employed at any of the ITT institutes about which they claim to have knowledge of misconduct or when they acquired the information they claim to possess. *E.g.*, ¶¶ 59, 63, 65, 70, 73-78, 80. Paragraph 63 is a good example:

Another method used to boost enrollment and placement figures was to "double count" students as enrollments and placements, according to the former dean of academics at an ITT Technical Institute in Memphis, Tennessee. Specifically, during the last two quarters, the director of the ITT Institute in Tennessee ordered that students who were graduating with associates degrees but could not find jobs should be convinced to enroll again for a bachelor's degree. That way, "those students would be counted twice: as a new enrollee and as a job placement." According to this former ITT dean of academics, the double counting was specifically intended to inflate enrollment rates to inflate ITT's stock price: "It was just a game to keep the numbers up so the stock would look good."

This information permits no inference of when the alleged "double counting" took place, since "the last two quarters" cannot be identified. There is no indication of when the former dean was employed at ITT, or when the director gave the alleged order. Even assuming any improper double counting did occur at the Memphis institute, with no reference to when it occurred, the allegation raises no inference that it rendered ITT's corporate statements made during the class period false or misleading.

Some of the allegations provide dates for conduct occurring outside the class period. For example, paragraph 67 describes court testimony by a former ITT instructor stating that attendance records at his institute were regularly altered between November 1999 and the first quarter of 2002. The plaintiff alleges no facts to support how such alterations affected corporate-wide statements issued between October 2002 and March 2004, the class period.

Moreover, with few exceptions, the allegations fail to provide any indication as to how the witnesses, who are identified by their job titles in the sparest terms, would be in a position to know about the acts to which they attest. The lack of allegations regarding how or why such employees would have access to the information they purport to possess is problematic because there is no way to tell if they are relaying information received first, second, or even third hand. Plaintiff identifies "former director[s] of recruitment," "former dean[s] of academics," "former instructor[s]," "former ITT employees," and so forth with no indication of what duties such positions entail at an ITT Technical Institute, with whom such individuals interact, or to what information or policy decisions or records such an individual would have access.

By contrast, applying the *Novak* test for the PSLRA pleading standard to allegations based on confidential witness testimony, the Ninth Circuit recently observed:

> Plaintiffs here describe the confidential witnesses with a large degree of specificity. Plaintiffs number each witness and describe his or her job description and responsibilities. In some instances, plaintiffs provide the witnesses' exact title and to which Daou executive the witness reported. For example, plaintiffs describe Confidential Witness # 6 as follows: "Confidential Witness # 6 ("CW6") is a former Daou executive who worked in the Finance Department. CW6 dealt with audit issues, Security and Exchange ("SEC") reporting and budget matters. As such, CW6 was familiar with Daou's process of collecting project cost information. CW6 reported to defendant McGee." Similarly, plaintiffs describe Confidential Witness # 9 as follows: "Confidential Witness 9 ("CW9") is a former Daou Regional Vice President of Sales. As Vice President of Sales, CW9 was responsible for reporting weekly or bi-weekly sales information, such as sales status/backlog and forecast/pipeline information, to Daou's

> Vice Presidents and corporate officers."  Given the specificity of
> plaintiffs' descriptions of their confidential witnesses, we hold that
> plaintiffs have sufficiently met the PSLRA's requirements for
> confidential witnesses.

*In re Daou Systems*, 411 F.3d at 1016.  Details of this sort are required by the PSLRA's heightened pleading standard if the plaintiff intends to rely on confidential witness statements.  Plaintiff in this case has not provided such details.

For example, paragraph 74 of the complaint alleges that a "former ITT marketing representative/recruiter . . . confirmed that students regularly received grades that were inflated."  In addition to lacking any indication as to when the witness was employed or when these grades may have been inflated, or how many grades may have been inflated, the allegation contains no specifics as to how a marketing representative would be in a position to obtain personal knowledge regarding grade inflation.

Similarly, paragraph 80 alleges that a "former ITT employee . . .  stated that ITT fabricated and stretched its student statistics and that ITT's graduated placement figures were inaccurate by at least 20%."  Again, no facts are alleged as to when this fabrication and stretching occurred or how the former employee learned or was in a position to know of it.

Paragraph 70 states: "A former ITT instructor at the ITT Technical Institute in Spokane, Washington also confirmed that the dean of his institute said that 'if a student shows up for class – even for a couple of minutes – mark them down as present.'" Again, when did the dean say this? And to whom; to the former instructor, or to someone else? And was the directive acted upon? How many times? And when? Plaintiff is not required to quantify its allegations precisely, but most of the allegations in the complaint contain no attempt at quantification whatsoever. See, *e.g.*, ¶¶ 56-57, 59, 61-63, 72-3, 75, 81. In paragraph 63 (reproduced above), for example, how many students were convinced to re-enroll in a bachelor's program? Two? Two hundred? Other allegations rely on vague language such as "many" or "most" or "more" students (¶¶ 59, 64-65), or "a substantial portion" (¶ 58), or "it was common" (¶ 66). Such language does not provide a meaningful basis to quantify even roughly the effect of the alleged local misconduct on the company's national numbers, and hence on the company's public statements made during the class period.

Plaintiff faults the defendants for sifting through and identifying isolated allegations in the complaint that may fall short of the PSLRA standard. Plaintiff argues that the court should view the allegations "not in isolation, but in the aggregate, drawing all inferences in lead Plaintiff's favor." Pl. Br. at 18. This argument might have merit on a motion to dismiss solely under Rule 12(b)(6), but it is not sufficient under the PSLRA. Unlike the standard under Rule 12(b)(6), the PSLRA requires facts supporting beliefs to be pled with particularity where the

allegations, as here, are made on information and belief.  This is a more stringent standard.  A court cannot aggregate allegations relying on confidential witnesses' testimony that have not been pleaded with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314.

Plaintiff argues that "numerous former employees at different ITT institutes relayed strikingly similar facts."  Pl. Br. at 18.  Plaintiff cites the First Circuit which, applying the PSLRA standard articulated in *Novak*, stated that

> Overall, the accumulated amount of detail the sources provide tends to be self-verifying; these are not conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred, provided by persons said to have personal knowledge of them.  In addition, the number of different sources helps the complaint meet the standard.  Their consistent accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two former employees, possibly disgruntled.

*In re Cabletron Systems, Inc.,* 311 F.3d at 30.  This may well be an appropriate application of the PSLRA standard to the very detailed allegations based on confidential witnesses in that case.  See *id.* at 30-31.

The plaintiff in this case has not approached such detail and particularity. Each of its allegations based on witness testimony suffers from one or more of these deficiencies:  lack of information establishing how or why such employees would have access to the information they purport to possess; lack of any time frame for their employment or for the alleged misconduct; and lack of any

meaningful basis to quantify the effect of the alleged misconduct even roughly. These failings are especially problematic because plaintiff relies on statements by former employees who worked in *local* ITT institutes. Plaintiff's burden is to raise an inference of fraud concerning ITT's business on a national scale during the class period. The court is unable draw such an inference from the information provided by the plaintiff based on confidential witness testimony.

III.   *The California Attorney General's Investigation*

Paragraph 10 of the complaint alleges that on March 9, 2004,"for the very first time, ITT disclosed [in its 2004 proxy statement] that the California Attorney General had been investigating the Company *since October 2002* and that its investigation was focusing on whether ITT falsified student grades and attendance records used for financial aid qualification."

The gap in time between the onset of the investigation and the disclosure does not, without more, provide a basis for a securities fraud claim, even assuming the materiality of the California Attorney General's ("CAG") investigation. Companies do not "have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession. [T]hat is not the way the securities laws work. We do not have a system of continuous disclosure. Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001).

The relevant positive law is Rule 10b-5.  The language of 10b-5 proscribes only those omissions that render affirmative *statements* misleading.  The positive law duty to disclose is created when a firm makes a statement that would be rendered false or misleading without the disclosure.

Plaintiff has specifically identified several statements it contends were rendered false or misleading by the defendants' failure to disclose the CAG investigation between October 2002 and March 2004.  Pl. Br. at 11-12.  Plaintiff cites four press releases and one conference call in which "Defendants touted that [ITT's] increased enrollment was attributable to a 'strong' business model and an effective marketing campaign."  *Id.*, citing ¶¶ 87, 93-95, 101.  Also, in ITT's 2003 Form 10k filed with the SEC, defendants stated, "We believe that all of our institutes substantially comply with the [Higher Education Act] and its implementing regulations."  Pl. Br. at 11.  In the same Form 10k, defendants also stated:  "Our internal audit department reviews our institute's compliance with Title IV Program requirements."  *Id.*  The plaintiff argues that these statements were false and misleading because,

> while the Defendants were repeatedly boasting about the above, they knew that the California AG was investigating the bona fides of, among other things, ITT's falsification of records relating to student grades and attendance records used for financial aid qualification. ¶¶ 162-165.  This fact – which goes to the very heart of Defendants' operations and which was known to Defendants as early as October 2002 – rendered Defendants' statements misleading and thus should have been disclosed.

*Id.* at 12.

This argument does not explain how statements attributing increased enrollment to a strong business model and effective marketing are rendered misleading by failure to disclose the CAG investigation.  A company can have a strong business model, effective marketing and increasing enrollment and at the same time be the object of a state investigation.  Plaintiff's burden was to explain with particularity why this general principle did not apply to ITT.  The existence of the CAG investigation alone does not establish systemic nationwide misconduct any more than plaintiff's insufficient allegations based on confidential witnesses.

Likewise, plaintiff's argument does not explain how statements about a company's belief in its compliance with Title IV of the Higher Education Act, or that its internal audit department reviews that compliance, are rendered false or misleading by the failure to disclose the CAG investigation.  A company can both believe in and internally monitor its compliance with federal law and be the object of a state investigation, even one targeted at the very metrics of that compliance. Again, plaintiff's burden was to explain why this did not apply to ITT.  Plaintiff has not carried it with the particularity required by Rule 9(b) or the PSLRA. Accordingly, the plaintiff has failed to state a claim for securities fraud arising from defendants' allegedly belated disclosure of the CAG investigation.

IV.    *The Alleged GAAP Violations*

Plaintiff points to numerous financial statements and reports issued throughout the class period stating that the financial information contained in

them was prepared according to generally accepted accounting principles ("GAAP"). Plaintiff has identified these statements and reports with particularity sufficient under the PSLRA and Rule 9(b). However, Rule 9(b) and the PSLRA require particularity and detail with regard to not only the allegedly fraudulent statements or omissions, but also the underlying factual circumstances that make the statements or omissions false or misleading. See *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); 15 U.S.C. § 78u-4(b)(1). Plaintiff has not met these requirements.

The plaintiff's allegations relating to violations of GAAP are contained in paragraphs 166 through 185 of the complaint. Many of these are mere statements of what is required by various provisions of GAAP and certain SEC reporting requirements, without any indication or suggestion as to how the defendants violated them. See, *e.g.*, ¶¶ 167-68, 170-72, 174, 184. Others that amount to allegations of GAAP violations or other accounting fraud by the defendants are based entirely on the alleged misconduct described by the confidential witnesses or on other unspecified "fraudulent and inappropriate business practices." See, *e.g.*, ¶¶ 169, 175-76, 179, 180. Allegations of accounting improprieties based solely on the facts as alleged by the confidential witnesses add nothing to the allegations of the witnesses themselves.

Several allegations are slightly more specific but equally unsupported. Paragraph 173 begins by alleging that "ITT improperly recognized revenue where

the timing or amount of revenue was not recorded in accordance with GAAP." It follows this statement with extensive quotations from various Statements of Financial Accounting Concepts as set forth by the Financial Accounting Standards Board, but with not a single additional fact particular to the defendants or to the initial allegation. Similarly, paragraph 177 alleges that "ITT overstated tuition revenue by failing to appropriately account for initial concerns related to the collectibility of student receivables. GAAP precludes the immediate recognition [of] revenue when there is an initial concern about whether corresponding revenue can be collected." There are no further factual allegations. Paragraph 182 alleges that "ITT was grossly reckless in failing to maintain adequate internal accounting controls," followed by a quotation from the American Institute of CPA's Auditing Standards defining "internal controls." There are no further factual allegations.

Paragraph 181 alleges that defendants violated GAAP by not disclosing the CAG investigation. According to the plaintiff, the Financial Accounting Standards Board's Statement of Financial Accounting Concepts No. 5 ("SFAC") requires

> that financial statements disclose contingencies when it is at least reasonably possible, *e.g.*, a greater than slight chance, that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made. Thus, under GAAP, Defendants were required to disclose the California Attorney General's investigation as early as October 2002.

The allegation bears several shortcomings. First, as noted above, a firm does not have an independent duty to disclose all news that may affect its stock

price.  "Instead, firms are entitled to keep silent . . . unless positive law creates a duty to disclose."  *Gallagher v. Abbott Labs.*, 269 F.3d at 808; *Gaines v. Guidant Corp.*, 2004 WL 2538374, at *11 (S.D. Ind. Nov. 8, 2004).

Plaintiff's allegation suggests that SFAC No. 5 is such a positive law creating such a duty.  However, violation of SFAC No. 5, without more, will not support a securities fraud claim.  Again, the relevant positive law is Rule 10b-5, which proscribes only those omissions that render actual statements misleading.  With regard to its allegations of GAAP violations, the plaintiff has specified no statements rendered false or misleading by the defendants' failure to disclose the CAG investigation.  See *Gallagher v. Abbott Labs.*, 269 F.3d at 808 ("What sinks plaintiffs' position is their inability to identify any false statement – or for that matter any truthful statement made misleading by the omission of news about the FDA's demands.").

Several of the allegations in the complaint's general listing of allegedly false or misleading statements refer to SEC quarterly filings containing the statement: "We prepared the accompanying unaudited consolidated financial statements in accordance with generally accepted accounting principles."  ¶¶ 91, 98, 104, 114, 122.  Plaintiff did not specify these statements as the basis for the allegation in paragraph 181.  However, even if it had, plaintiff provided no particularized facts to support the view that failing to disclose the CAG investigation violated GAAP.  Paragraph 181 merely paraphrases SFAC No. 5, then concludes the existence, and

assumes the violation, of the duty to disclose the investigation. This falls short of the pleading standards under Rule 9(b) and the PSLRA. Plaintiff may not leave to the court the task of determining, nor will the court assume, how the defendants' failure to disclose the CAG investigation ran afoul of SFAC No. 5 and if so, which statement(s) this rendered false or misleading.

For the foregoing reasons, plaintiff has failed to plead its allegations of fraud based on GAAP violations with particularity sufficient to satisfy Rule 9(b) or the PSLRA.

V.     *Scienter*

While Rule 9(b) allows state of mind to be "averred generally," the PSLRA

imposes a substantially higher standard:  "In any private action arising under this

chapter in which the plaintiff may recover money damages only on proof that the

defendant acted with a particular state of mind, the complaint shall, with respect

to each act or omission alleged to violate this chapter, state with particularity facts

giving rise to a strong inference that the defendant acted with the required state

of mind."  15 U.S.C. § 78u-4(b)(2).  To prevail on its claims, the plaintiff must

prove that a defendant acted with "scienter."  As applied to securities fraud claims,

scienter refers to "a mental state embracing intent to deceive, manipulate, or

defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Reckless

disregard for the truth is sufficient to meet the scienter requirement in the

Seventh Circuit, but the Seventh Circuit has cautioned that recklessness is still

a demanding standard different from even serious or "inexcusable" negligence:

> [R]eckless conduct may be defined as a highly unreasonable
> omission, involving not merely simple, or even inexcusable
> negligence, but an extreme departure from the standards of ordinary
> care, and which presents a danger of misleading buyers or sellers
> that is either known to the defendant or is so obvious that the actor
> must have been aware of it.

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977),

quoting *Franke v. Midwestern Oklahoma Development Authority*, 428 F. Supp. 719

(W.D. Okla. 1976); see also *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th

Cir. 1977) ("In view of the Supreme Court's analysis in *Hochfelder* of the statutory

scheme of implied private remedies and express remedies, the definition of 'reckless behavior' should not be a liberal one lest any discernible distinction between 'scienter' and 'negligence' be obliterated for these purposes.").

Plaintiff has not alleged any direct evidence of fraudulent scienter.  Its allegations of scienter are based on allegations (a) that the fraudulent scheme was pervasive, widespread, and involved the core ITT business, (b) that the individual defendants were on notice of improper practices, and (c) that the individual defendants had the motive and opportunity to engage in fraud as indicated by ITT's compensation system and the defendants' sales of ITT stock over the 17-month class period.  None of these allegations support the "strong inference" of scienter required by the PSLRA.

A.      *Pervasive and Widespread Scheme?*

Courts considering securities fraud claims have accepted two common-sense principles.  First, the closer a situation is to a business's core operations, the more reasonable it may be to infer that senior management is aware of the situation.  *E.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489-90 (S.D.N.Y. 2004); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).  Second, the more pervasive and widespread a fraudulent scheme is within a company, the more reasonable it may be to infer that senior executives were aware of the scheme.  *E.g.*, *In re Sunbeam Sec. Litig.*, 89 F. Supp.

2d 1326, 1338-39 (S.D. Fla. 1999); *Danis v. USN Communications, Inc.*, 73 F.
Supp. 2d 923, 938-39 (N.D. Ill. 1999).

Plaintiff has tried to take advantage of these principles by labeling the
alleged scheme pervasive and widespread. For the reasons described above, the
meat in plaintiff's allegations falls well short of that description. The description
was based in large part on the assumption that fraud was occurring at any facility
where the federal agents executed search warrants. Even that tenuous
assumption has been undermined by the closing of the criminal investigation. To
the extent the description was based on the confidential witness statements, when
those that have no time reference and those that lack other essential foundations
are pared away, very little remains – at most a small handful of ITT's 77 locations
nationwide. That remainder certainly is not enough to support the inference of
scienter on the premise that the scheme was pervasive and widespread. Without
that support, the allegation of wrongdoing at some local institutes, even in the
core business, does not support an inference of scienter on the part of senior
management and the corporation itself.

B.     *Notice to Individual Defendants*

Plaintiff also argues that some or all of the individual defendants had notice
of the wrongdoing. To support this argument, plaintiff relies on the October 2002
notice from the California Attorney General that it had commenced an
investigation of ITT's activities in California. From the document requests, ITT

could discern that the investigation concerned whether ITT had falsified records of student attendance, grades, and academic progress that would be relevant to qualification for state financial aid, and whether ITT had retaliated against employees who had complained about these alleged acts.   Notice of an investigation falls well short of notice of wrongdoing.

Plaintiff also relies on a meeting between a former instructor at the Sylmar, California institute and two ITT officials who are not named as defendants, Gary Carlson and an unidentified lawyer.  According to plaintiff, the instructor told Carlson and the lawyer about "specific instances of fraud at the Sylmar Institute and stated that documents had been turned over to the Office of the Inspector General of the U.S. Department of Education." Cplt. ¶¶ 71, 157.  Plaintiff alleges that Carlson reported to defendant Thomas Laurer, who reported in turn to defendant Omer Waddles, but there is no allegation that Laurer or Waddles had actual knowledge of the report.

Plaintiff also alleges that an ITT attorney attended depositions in lawsuits in which employees testified about grade inflation at the Sylmar institute.  ¶¶ 77, 158.  It's difficult to see how this information supports a strong inference that any of the company's senior management supposedly knew their corporate financial statements were deceptive.  Similarly, the allegation that a former director of recruitment at an institute in Washington sent a letter to CEO Champagne in September or October 2002 (perhaps just barely in the class period) telling him

of unspecified fraud occurring at that institute does not support a strong inference of knowledge of widespread fraud that would render fraudulent the corporate communications to investors.  See ¶ 159.

Plaintiff also alleges that defendant Araskog initially denied that he knew about the CAG investigation and later retracted his denial.  ¶ 163.  The complaint provides no details about the circumstances of either statement except to say that the denial occurred before Araskog sold some shares of ITT.  The information before the court shows that Araskog sold about 46 percent of his ITT shares four months after he learned of the investigation.  There is no linkage that supports an inference of scienter here.

Plaintiff alleges that documents were destroyed under suspicious circumstances at two local institutes that were the subject of government inquiries.  Cplt. ¶¶ 82-83.  The court assumes that these allegations might support an inference that the individuals who did so were engaged in some wrongdoing, but there is no linkage to the senior corporate managers whom plaintiff has sued.

Finally, plaintiff contends that the individual defendants' active management of the company, in terms of setting financial and other performance goals, encouraging subordinates to meet those goals, and monitoring achievement of goals, supports an inference of knowledge of wrongdoing and scienter in issuing

-38-

statements to investors.  Such allegations of routine corporate management fall short of supporting an inference of fraudulent scienter.

C.   *Compensation and Stock Sales*

Plaintiff also relies on the fact that the individual defendants benefitted financially from higher stock prices.  As many courts have observed, nearly all for-profit corporations compensate executives for successful financial performance as measured in the stock market, so this fact does not support a strong inference of scienter.  Judge Moran has explained:  "If scienter could be pled solely on the basis of plaintiff's allegations that defendants were motivated to defraud the public in order to inflate the stock price, 'virtually every company in the United States that experiences a downturn in stock price would be forced to defend securities fraud actions.'"  *Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1254 (N.D. Ill. 1997), quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); accord, *Phillips v. LCI International, Inc.*, 190 F.3d 609, 621-23 (4th Cir. 1999)  (allegations that defendant desired to retain a position on the corporation's board and obtain a higher price for his stock were not sufficient to support scienter under even the most lenient standard possible under the PSLRA); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 848 (N.D. Ill. 2003) (Castillo, J.) ("As we have previously concluded, maximizing both earning potential on corporate debt offerings and executive compensation are 'the goals of all corporate executives; as such, they do not even remotely suggest fraudulent motivation.'"), quoting *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000).

Plaintiff also relies heavily on the records of stock sales by the individual defendants.  In general, an unusual pattern of insider stock sales can provide circumstantial evidence of scienter.  *Acito*, 47 F.3d at 54; *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).  The key concept here is "unusual."  The trading "must be unusual, well beyond the normal patterns of trading by those defendants" before it will be found probative of scienter.  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197-98, 206 (1st Cir. 1999); accord, *Gaines v. Guidant Corp.*, 2004 WL 2538374, *17 & n.39 (S.D. Ind. Nov. 8, 2004).

In this case, the records of the defendants' stock sales do not show any unusual pattern that would lend any support to an inference of scienter.  The sales totaled $27 million, but they were spread out over fourteen months, beginning in January 2003, with more sales in February 2003, July and August 2003, October and November 2003, and January and February 2004.  See Cplt. ¶ 149.  To the extent that the existence of the CAG investigation might be deemed material inside information, no insider sale occurred for three months after the company learned of the investigation in October 2002.  The other sales continued sporadically over the next thirteen months.  Especially in view of the seventeen-month class period, this is not an unusual pattern that supports an inference of scienter.  Similarly, plaintiff has not provided information about the individual defendants' other holdings.  The information before the court shows that the defendants sold stock at different times and though there is a range of individual circumstances, all retained significant holdings of ITT stock.  The fact that all

retained significant holdings also weighs against any inference of scienter.  See *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999); *Friedman v. Rayovac Corp.*, 291 F. Supp. 2d 845, 856 (W.D. Wis. 2003).  The fact that sales occurred after earnings announcements means nothing.  Corporate insiders typically are barred from trading for a period of time before such announcements precisely to avoid charges of insider trading, so sales are often made after such announcements.  See *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002).

For all these reasons, the court finds that the Consolidated Class Action Complaint fails to plead an actionable violation of Rule 10b-5 with the specificity required by Rule 9(b) and the PSLRA.  The defendants' motion to dismiss the claim is granted.  See 15 U.S.C. § 78u-4(b)(3)(A) (if the complaint fails to meet the PSLRA standard, "the court shall, on the motion of any defendant, dismiss the complaint").

VI.     *Section 20(a)*

Section 20(a) of the 1934 Act provides a basis for holding individuals and businesses liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws:

> Every person who, directly or indirectly, controls any person *liable under any provision of this chapter or of any rule or regulation thereunder* shall also be liable jointly and severally with and to the

> same extent as such controlled person to any person to whom such
> controlled person is liable. . . .

15 U.S.C. § 78t (emphasis added).  Liability under section 20(a) must be based on an underlying violation of the securities laws or the rules promulgated under them.  See *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 617 (7th Cir. 1996); *In re Allied Products Corp. Securities Litigation*, No. 99-C-3597, 2000 WL 1721042, *2 (N.D. Ill. Nov. 15, 2000).  Because plaintiff has failed to plead a predicate violation of Section 10(b) or Rule 10b-5, the section 20(a) claims must be dismissed under Rule 12(b)(6) for failure to state claim upon which relief can be granted.  Plaintiff's section 20(a) claims are dismissed with leave to amend.

*Conclusion*

The plaintiff has failed to state a claim of securities fraud under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission.  Plaintiff's allegations do not meet the heightened pleading requirements of Rule 9(b) or the PSLRA.  Pursuant to Rule 12(b)(6), plaintiff's allegations of control person liability under section 20(a) of the Securities Exchange Act of 1934 fail to state a claim upon which relief can be granted.  For these reasons, the defendants' motion to dismiss the plaintiff's complaint is granted and plaintiff has one additional opportunity to amend it.  Plaintiff may file an amended complaint no later than October 14, 2005.  If no amended complaint is filed, the court will enter a judgment dismissing the case with prejudice. Defendants' request for judicial notice (Docket No. 105) and their first and second

motions for leave to file supplemental briefs (Docket Nos. 156 and 160) are also granted.

        So ordered.

Date: September 14, 2005

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Arend J. Abel
COHEN & MALAD LLP
aabel@cohenandmalad.com

Elizabeth Ann Brem
GIBSON DUNN & CRUTCHER,  LLP
ebrem@gibsondunn.com

Luke Brooks
LERACH COUGHLIN STOIA & ROBBINS, LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111

James A. L. Buddenbaum
PARR RICHEY OBREMSKEY & MORTON
jbuddenbaum@parrlaw.com

Daniel K. Burke
ICE MILLER
daniel.burke@icemiller.com

David J. Cutshaw
COHEN & MALAD LLP
dcutshaw@cohenandmalad.com

Glen Devalerio
BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO
One Liberty Square
Boston, MA 021091

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Jay P. Kennedy
KROGER GARDIS & REGAS
jpk@kgrlaw.com

Michael G. Lange
BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO
mlange@bermanesq.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Thomas Eugene Mixdorf
ICE MILLER
thomas.mixdorf@icemiller.com

Robert E. Palmer
GIBSON DUNN & CRUTCHER, LLP
rpalmer@gibsondunn.com

Henry J. Price
PRICE WAICUKAUSKI RILEY & DEBROTA
hprice@price-law.com

Julie A. Richmond
BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO
jrichmond@bermanesq.com

Darren J. Robbins
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
e_file_sd@lerachlaw.com

Erich D. Schiefelbine
GIBSON DUNN & CRUTCHER, LLP
eschiefelbine@gibsondunn.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

Wayne W. Smith
GIBSON DUNN & CRUTCHER, LLP

wsmith@gibsondunn.com

Daniel S. Sommers
COHEN MILSTEIN HAUSFELD & TOLL PLLC
dsommers@cmht.com

Philip A. Whistler
ICE MILLER
philip.whistler@icemiller.com

Robert W. York
ROBET W. YORK & ASSOCIATES
rwyork@york-law.com